UNITED STATES of America, Appellee,

v.

Patrick MURPHY, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Kevin W. DEYO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Steven J. QUINLIVAN, Defendant, Appellant.

Nos. 84–1599, 84–1600 and 84–1671.

United States Court of Appeals, First Circuit.

Argued Jan. 7, 1985.

Decided June 3, 1985.

Seth M. Kalberg, Jr., Boston, Mass., for Steven J. Quinlivan.

Robert H. Astor, Northampton, Mass., for Patrick Murphy.

Stephen R. Kaplan, Northampton, Mass., with whom William St. James, Northampton, Mass., was on brief for Kevin W. Deyo.

Henry L. Rigali, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief for appellee.

Before COFFIN and ALDRICH, Circuit Judges, and GIGNOUX,* Senior District Judge.

GIGNOUX, Senior District Judge.

Defendants-appellants Patrick Murphy, Kevin W. Deyo, and Steven J. Quinlivan were named in a one-count indictment charging them with knowingly and intentionally using threats of serious bodily harm to influence the testimony of a witness in an official proceeding, in violation of 18 U.S.C. § 1512(a)(1). After a joint jury trial in the United States District Court for the District of Massachusetts, all three defendants were convicted. On appeal, they charge numerous errors, of which we address only the allegation that the indictment lacked the specificity required to support the convictions. We reverse.

## I.

### The Background

The evidence at trial, viewed in the light most favorable to the government, *United States v. Mora,* 598 F.2d 682, 683 (1st Cir. 1979), may be summarized as follows: Richard Watson was a drug informant in state and local police investigations in Franklin County, Massachusetts, from August 1983 through March 1984. During the same period, he also became an informant for the United States Drug Enforcement Administration (DEA) in the Springfield area. Acting as a state informant, Watson introduced many people, including the appellant Murphy and Karin Dumas-Murphy [1] to an undercover state police officer, Kenneth Sullivan. Acting as a federal informant, he purchased cocaine from one Haythem Dawlett on several different occasions.

On March 9, 1984, Dawlett was arrested on federal charges of distributing cocaine. On the same date, apparently as a result of Watson's participation as an informant, between 32 and 35 suspects were arrested on state narcotics charges. On March 21, 1984, Watson testified before the federal grand jury in Springfield as a government witness in the Dawlett investigation.

Appellants and Dumas-Murphy were the subject of a separate DEA investigation of dilaudid distribution in Franklin County, which was being conducted about the same time as the foregoing federal Dawlett and state narcotics investigations. They were arrested on March 9 on federal charges of distributing dilaudid. Watson played no part in this dilaudid investigation.[2]

---

* Of the District of Maine, sitting by designation.

1. Dumas-Murphy, the wife of Patrick Murphy, was also indicted, but her case was otherwise disposed of.

2. Quinlivan identified an informant named David Nagle as responsible for his arrest. Deyo testified he was arrested "through" DEA Agent Edward O'Brien.

On March 23 appellants and Dumas-Murphy came to the United States District Court in Springfield for a 10:00 a.m. arraignment on charges of distributing dilaudid. Coincidentally, on the same day, Watson also came to the Federal Courthouse in Springfield. He had an 11:00 a.m. meeting on an unrelated matter with DEA Agent Edward O'Brien, whose office was in the courthouse building. Watson had taken the precaution of calling the DEA office from the Baystate West Shopping Mall near the courthouse to check if it was safe to approach the office.

As Watson neared the courthouse, he saw appellants and Dumas-Murphy coming towards him from the direction of the courthouse. At least one of them recognized Watson, and Watson heard one of them say something like, "There's Rick."

Watson became frightened, turned around, and quickly walked back into the Baystate West Shopping Mall. He testified at the trial that appellants and Dumas-Murphy followed him through the mall, and as he was crossing the street beyond the mall, he heard one of them yell something to the effect of, "Let's break his legs ... let's kill him."

Watson testified that he then began running and that appellants and Dumas-Murphy initially followed him. He stated that he eventually was able to lose his pursuers. He then called the DEA office, and later went home.[3]

## II.

### The Sufficiency of the Indictment

The statute under which appellants were indicted, 18 U.S.C. § 1512(a)(1), provides:

(a) Whoever knowingly uses intimidation or physical force, or threatens another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(1) influence the testimony of any person in an official proceeding ...

shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

The statute further provides that the official proceeding "need not be pending or about to be instituted at the time of the offense." 18 U.S.C. § 1512(d)(1).

The indictment against defendants charged that:

On or about March 23, 1984, within the District of Massachusetts, the defendants,

STEVEN J. QUINLIVAN,

PATRICK MURPHY,

KARIN DUMAS–MURPHY, and

KEVIN W. DEYO,

did knowingly and intentionally use intimidation or physical force, or did threaten another person or did attempt to do so, with intent to influence the testimony of any person in an official proceeding; namely did threaten Richard Watson, a witness in an official proceeding, with serious bodily harm; in violation of Title 18, United States Code, Section 1512(a)(1).

The indictment, other than parroting the statute, and giving the date of the alleged offense as March 23, 1984, charged the defendants with "threaten[ing] Richard Watson, a witness in an official proceeding." What the proceeding was, or was to be, was in no way indicated. As the government states in its brief, "[T]he indictment is broad enough to include proof that the Appellants sought to influence Watson's testimony in any federal case." Govt. Brief at 34. On this indictment, it cannot be known what official proceeding the grand jury had in mind or the defendants must be prepared to meet.

---

**3.** Appellants and Dumas-Murphy dispute Watson's story. Dumas-Murphy testified that she saw Watson walking towards the courthouse as she and appellants left it. She saw Watson turn rapidly around when he saw them. She stated that she and appellants after their arraignment walked into the Baystate West Mall, where her car was parked, and drove directly home. Deyo and Quinlivan both testified that after their arraignment they simply went to the parking lot and drove home.

Fed.R.Crim.P. 7(c)(1) states that an "indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." It is a basic principle that, in order to guarantee protection of a criminal defendant's rights, an indictment must "contain[ ] the elements of the offense intended to be charged, 'and sufficiently apprise[ ] the defendant of what he must be prepared to meet,'" *Russell v. United States*, 369 U.S. 749, 763, 82 S.Ct. 1038, 1046, 8 L.Ed.2d 240 (1962) (citations omitted). As we stated in *United States v. Tomasetta*, 429 F.2d 978, 979 (1st Cir.1970):

A vital function of an indictment is to provide "such description of the particular act alleged to have been committed by the accused as will enable him properly to defend against the accusation * *." This principle is derived directly from the Sixth Amendment's guarantee of the right of an accused "to be informed of the nature and cause of the accusation * * * " and is basic to the proper functioning of our adversary system of justice. Without sufficient information to identify that conduct which the grand jury has deemed adequate to support an indictment, an accused is at a material disadvantage in meeting the charge against him. (footnote omitted).

The Supreme Court in the leading case of *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240, analyzed the requirements of a valid indictment. It found indictments defective which were brought under 2 U.S.C. § 192, which prohibited witnesses before congressional committees from "refus[ing] to answer any question pertinent to the question under inquiry." The indictments did not identify the "question under inquiry" although they did list the questions the defendants had refused to answer.

The Court deemed the "core of criminality" under the statute to be the pertinency to the subject under inquiry of the question a witness refused to answer. *Id.* at 764, 82 S.Ct. at 1047. The topic under inquiry was necessarily central to every prosecution under the statute because on it hinged the legality or illegality of a defendant's acts. The Court wrote:

Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute.

*Id.* The Court concluded that the indictments were fatally defective because they did not specify the question under inquiry. *Id.* at 771, 82 S.Ct. at 1051.

The indictment in the instant case did not identify *any* proceeding in which defendants were allegedly attempting to influence Watson's testimony. It is wholly unclear from the indictment whether the grand jury was charging that defendants tried to influence Watson's testimony in the proceeding against Dawlett, or in the proceeding against them, or in some other proceeding altogether. Crucial to preparation of any defense to a charge under the statute is at least some indication of the identity of the proceeding in which the defendant tried to influence testimony. The indictment at issue here presented no such indication, and as such it did not "sufficiently apprise[ ] the defendant[s] of what [they] must be prepared to meet." *Russell v. United States*, 369 U.S. at 763, 82 S.Ct. at 1046; *United States v. Tomasetta*, 429 F.2d at 979.

The government maintains that appellants should have moved for a Bill of Particulars under Fed.R.Crim.P. 7(f) if they had wanted more definite information than was provided in the indictment. This argument is specious, since it has long been settled law that an invalid indictment cannot be cured by a Bill of Particulars. *Russell v. United States*, 369 U.S. at 770, 82 S.Ct. at 1050; C. Wright, 1 *Federal Practice and Procedure* § 129 (1982).

The course of the trial in this case amply demonstrates the importance of the protections mandated by *Russell*. The prosecutor's opening identified the case against Dawlett as the "official proceeding" in which Watson was going to testify. No suggestion was made that appellants were

charged with attempting to influence Watson's testimony in the proceeding against them. Based on the indictment and the opening, defendants had knowledge only that the prosecution would seek to prove they were trying to affect Watson's testimony in the Dawlett action. In closing, the prosecutor stated that the proceeding in which defendants sought to influence Watson's testimony need not be the Dawlett proceeding nor need it be the case against them. The government kept its options open. Indeed, in its brief on appeal the government acknowledges the open-ended character of its case:

> The government pressed two theories of the Appellants guilt to the jury. One theory was that the Appellants attempted to intimidate Watson with intent to influence his testimony under the mistaken belief that Watson was a witness against them in the federal narcotics case for which they were arraigned moments before the incident.
>
> The Government's second theory was that the Appellants had learned that Watson was a witness in the *Dawlett* case and through intimidation sought to influence his testimony in that federal proceeding.

Govt. Brief at 7.

Appellants' objection to the sufficiency of the indictment was not raised until the oral argument before us on appeal. There is no question that defendants should have filed a timely motion to dismiss the indictment, *see* Fed.R.Crim.P. 12(b)(2), and ordinarily, this Court will not consider issues which have not been raised before the trial court. However, as the Supreme Court has stated, "[i]n exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings." *Silber v. United States*, 370 U.S. 717, 718, 82 S.Ct. 1287, 1288, 8 L.Ed.2d 798 (1962) (per curiam), *quoting United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed.

555 (1936). *See Rogers v. United States*, 422 U.S. 35, 41, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975); *United States v. Previte*, 648 F.2d 73, 81 (1st Cir.1981); *Thompson v. United States*, 495 F.2d 1304, 1306 (1st Cir.1974). This principle is embodied in Fed.R.Crim.P. 52(b), which provides that plain errors or defects affecting substantial rights may be noticed even though not brought to the attention of the court.

In the instant case, the indictment was defective because it did not adequately apprise the defendants of the charges against them. In these circumstances, we notice the defect on appeal as one which seriously affected the fairness, integrity and public reputation of a judicial proceeding.

*Reversed and remanded with instructions to dismiss the indictment.*