# United States Court of Appeals
## For the First Circuit

No. 99-1983

UNITED STATES,

Appellee,

v.

CHERYL B. STEIN,

Defendant, Appellant.

No. 99-1985

UNITED STATES

Appellee,

v.

WENDY B. GOLENBOCK,

Defendant, Appellant.

No. 99-1987

UNITED STATES,

Appellee,

v.

SUSAN OTIS,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, <u>U.S. District Judge</u>]

———————

Before

Selya, <u>Circuit Judge</u>,

Campbell, <u>Senior Circuit Judge</u>,

and Lipez, <u>Circuit Judge</u>.

———————

<u>Kevin S. Nixon</u> for appellant Cheryl B. Stein.
<u>John J.E. Markham, II</u> with whom <u>Markham & Read</u> was on brief for appellant Wendy B. Golenbock.
<u>Richard D. Biggs</u> with whom <u>Marcia G. Shein</u> and the <u>Law Office of Shein & Biggs</u> were on brief for appellant Susan Otis.
<u>Mark J. Balthazard</u>, Assistant U.S. Attorney, with whom <u>Donald K. Stern</u>, United States Attorney, was on brief for appellee.

———————

November 28, 2000

———————

**CAMPBELL, <u>Senior Circuit Judge</u>.** Defendant-appellants Wendy B. Golenbock, Cheryl B. Stein and Susan B. Otis were each charged in an indictment with one count of bankruptcy fraud in violation of 18 U.S.C. § 152 and one count of conspiracy to commit bankruptcy fraud in violation of 18 U.S.C. § 371. The charges arose from their alleged concealment of Golenbock's and Stein's ownership interest in a summer home in Wellfleet, Massachusetts, which they placed in Otis's name in trust during bankruptcy proceedings. After a jury trial in the district court, Golenbock and Stein were convicted on both counts, and Otis was convicted on the conspiracy count. We affirm the convictions and sentences.

## I.

At the time of the bankruptcy proceedings, Golenbock and Otis were lawyers.[1] Golenbock and Stein worked and lived together in Weston, and were, at times, in the business of real estate development and management. Otis was a close personal friend of both.

A.      <u>The Wellfleet property</u>

On October 5, 1982, Golenbock and a friend named Ellen Ratner purchased a parcel of land on Bond Street in South

_____

[1]Stein is now also a lawyer.

Wellfleet, Massachusetts ("the Wellfleet property") for $18,000.[2]
To build a house on the property, they borrowed $56,700 from the
Cape Cod Five Cent Savings Bank ("Cape Cod Five"), secured by a
mortgage on the property. In 1986, Ratner sold her interest in
the Wellfleet property to Golenbock and Stein for $34,050. The
Cape Cod Five was notified of the transfer, and released Ratner
from the mortgage. Shortly thereafter, Golenbock and Stein
obtained an additional $50,000 line of credit from the Cape Cod
Five, secured by a second mortgage on the Wellfleet property.
Golenbock and Stein used the newly-built house on the Wellfleet
property as a vacation home, and sometimes rented it out.

B.        The transfer of the Wellfleet property to Otis

On September 25, 1990, Golenbock and Stein filed
separate Chapter 11 bankruptcy petitions. They did not list the
Wellfleet property as an asset in their bankruptcy schedules or
in their statement of financial affairs. Neither did Golenbock
and Stein list the Cape Cod Five as a creditor of theirs, state
that they had conveyed the Wellfleet property to anyone else in
the year before bankruptcy, nor identify the Wellfleet property
as being held or managed for someone else. Stein did not
disclose an ongoing civil action she had brought relating to a

---

[2]Ratner was not involved in this case.

hot tub she and Golenbock had had installed at the Wellfleet property.

Two days after Golenbock and Stein filed their bankruptcy petitions, Golenbock gave Otis a $15,000 check. On October 4, 1990, a deed was filed with the Barnstable Country Registry of Deeds conveying the Wellfleet property from Golenbock and Stein to Otis (under the name of Alekman) as sole trustee of the B.Z. Realty Trust, for a stated consideration of $108,000. The deed on its face was dated and notarized December 31, 1989. Stein testified at trial that the deed was signed in Andover, Massachusetts -- in Essex County -- on December 31, 1989, but the deed reflects that the signatures were notarized in Middlesex County, where Golenbock and Stein both lived.

At the same time as the deed was recorded, a Declaration of Trust for the B.Z. Realty Trust was also recorded. Two dates appeared on the Declaration as indicating when it was executed: August 1, 1989, and August 1, 1990.

Despite the stated consideration of $108,000, Otis did not pay any such sum to Golenbock and Stein. The mortgagor, Cape Cod Five, was not notified of the transaction. Golenbock and Stein continued to make regular mortgage and line of credit payments, often by postal money orders, bank checks or cash. The postal money orders and bank checks were obtained by

employees of Golenbock and Stein, at their instruction and using cash provided by them. Later payments were made using accounts controlled by Golenbock and Stein. They made all the payments until the property was sold in June 1996.

In addition to paying the mortgage, Golenbock and Stein also paid the telephone, electric, and trash pickup bills for the Wellfleet property while it was in Otis's name in trust. The accounts for those bills were changed to Otis's name beginning in 1991. However, the mailing address for the bills always remained Golenbock and Stein's post office box, which Otis did not use. Mail sent to the Wellfleet address was routed to Golenbock's and Stein's offices.

Golenbock and Stein also handled and paid for the insurance on the property after the title was transferred. In June, 1991, a year and a half after the date on the deed to Otis, and nine months after the deed was recorded, Golenbock and Stein applied for new homeowner's insurance for the property in their names only, with no reference to Otis or the Trust. The insurance for the Wellfleet property was designated for personal use, not commercial use. In July, 1991, they had Otis and the Trust added to the policy as additional insureds. Only Golenbock and Stein, however, were insured for the contents of the Wellfleet property and for the loss of use. All the

payments made for the Wellfleet property expenses were paid for or directed to be paid by Golenbock and Stein and their handwriting appears on checks and bills relating to those expenses.

Only Golenbock and Stein dealt with the real estate broker for the rental of the property. The income tax forms for the rental were mailed only to Golenbock and Stein's post office box. The tax form for the rent for the year 1990 was issued to Golenbock. The name was changed to Otis in 1991, at Golenbock's direction. Rental income checks from the real estate broker were payable to Otis in 1991, but were endorsed by Golenbock.

C.      Golenbock and Stein's bankruptcy proceedings

In November, 1990, several weeks after filing their bankruptcy petitions, Golenbock testified under oath at a bankruptcy meeting of creditors ("341 meeting") that she had not conveyed any property within the prior year to an insider or "good friend." She did not include the Cape Cod Five when listing the banks to which she owed money. Stein attended a 341 meeting in 1990, and both Golenbock and Stein attended another 341 meeting in June, 1992. At none of those meetings did either disclose to the representative of the U.S. Trustee's Office, who was conducting their examinations, an ownership interest in the Wellfleet property, its transfer in the year before the

bankruptcy, or the existence of the Cape Cod Five debt. Golenbock and Stein's regular reports and cash flow statements submitted to the U.S. Trustee's Office did not reflect the payments they were making in connection with the Wellfleet property expenses.

In November 1991, Golenbock testified in a bankruptcy deposition conducted by one of her creditors. After being confronted with the creditor's knowledge of her prior interest in the Wellfleet property, she admitted that she had owned it. She stated, however, that it had been sold in 1989 to Otis. Golenbock further testified that she had transferred the property because she could not pay the mortgage.

In 1994, after Golenbock and Stein's bankruptcy cases had been converted to Chapter 7 liquidations, another 341 meeting was conducted, this time by their appointed bankruptcy trustee. Both Stein and Golenbock testified under oath at that meeting. They affirmed that the only property they still owned was their primary residence, and did not disclose any interest in the Wellfleet property. The trustee only learned about their involvement in the Wellfleet property in 1997, when he heard it from the U.S. Trustee's Office.

In April 1995, Golenbock and Stein received their bankruptcy discharges. By August 1995, while title to the

Wellfleet property was still in Otis's name in trust, Golenbock and Stein resumed making the mortgage payments directly from Golenbock's bank account. In March, 1996, both bankruptcy cases were closed.

D.        The sale of the Wellfleet property

In early 1996, Golenbock contacted a real estate broker to list the Wellfleet property for sale. Golenbock and Stein, not Otis, dealt directly with the real estate broker during the sale process. In June 1996, the Wellfleet property was sold for $175,000, and a check for $65,906.66, most of the profits, was issued to Otis. She endorsed it to Golenbock on behalf of Max Golenbock-Stein, Golenbock and Stein's six-year-old son.

Although the funds were deposited in Golenbock's client trust account in Max's name, the account was used for Golenbock and Stein's personal and business purposes. For example, $5,100 was paid from the account to Stein for "New England School of Law," which Stein was attending, and nearly $10,000 in checks were paid from the account to Golenbock personally, for no stated purpose. The account was also used to deposit a $27,500 settlement check received from an insurance company for one of Golenbock's law clients, and to issue the $25,000 disbursement check to the client. The rest of the profits from the sale, in the form of two checks totaling over $8,000, were issued to Otis

by the real estate broker. Otis also endorsed those over and they were deposited into Golenbock's master client account.

E.      The B.B.O. testimony

Before any criminal charges were filed against Golenbock, the Massachusetts Board of Bar Overseers (B.B.O.) initiated an investigation of her professional conduct with regard to a number of matters. On December 21, 1995, Golenbock testified in the first of seven depositions before the Massachusetts Board of Bar Overseers. She did not know of any potential criminal investigation at that time, and answered questions about clients she had represented and the handling of funds, as well as her bankruptcy filing. There were no references to the Wellfleet property in this deposition.

On or around January 11, 1996, before the next scheduled deposition, the B.B.O. notified Golenbock by letter that it was concerned about certain aspects of her bankruptcy proceeding. This letter did not mention the Wellfleet property. Golenbock's attorney became concerned about the possibility of a criminal proceeding, and advised her to assert her Fifth Amendment privilege. On April 25, 1996, Golenbock again appeared before the B.B.O. Again, none of the questions referred to the Wellfleet property. Golenbock declined to answer any questions, asserting her Fifth Amendment privilege.

Golenbock then changed attorneys, retaining Edward Barshak for his expertise in B.B.O. practice. Barshak advised her as follows, as recounted in his affidavit:

> I told her that if she continued to remain silent, she would be penalized. The penalty would be that the BBO would hold her silence against her. Specifically, the BBO would be allowed to draw from her silence any adverse inferences relating to any area of the investigation she refused to discuss. I also told her that those adverse inferences would mean that the BBO would find against her in relation to those areas of the investigation and that as a result, she would be disbarred or suspended.

On November 1, 1996, Golenbock again appeared before the B.B.O., and this time chose to forego her Fifth Amendment privilege and to answer the questions put to her. She answered additional questions on November 15, 1996. The testimony in these depositions concerned the Wellfleet property and other matters relevant to the subsequent criminal case against her.

Otis also testified before the B.B.O. on multiple occasions beginning in January, 1996. There, she stated that she became aware of Golenbock's and Stein's bankruptcy filings "at some point." In 1992, Otis had submitted to the Internal Revenue Service a 1991 pleading from Golenbock's and Stein's bankruptcy cases, as well as a copy of the deed, in response to an inquiry concerning her 1992 tax return. Otis also told the B.B.O. that she made none of the mortgage payments and provided

-11-

none of the funds to do so. However, she and her husband reported the income and mortgage payments on the Wellfleet property in their federal income tax returns for the years 1991-1994. Otis also testified that all the expenses of the Wellfleet property were being paid from its rental income. Her tax returns, however, reflected that there was no rental income for several years. In 1991, the one year in which there was reported rental income, it amounted to less than half of the mortgage payments.

F.        The motion to suppress

On March 18, 1998, all three defendants were charged with one count of bankruptcy fraud in violation of 18 U.S.C. § 152 and one count of conspiracy to commit bankruptcy fraud in violation of 18 U.S.C. § 371. A superseding indictment charging the same offenses was returned on August 5, 1998.

The government sought to offer in evidence some of the statements that Golenbock had made to the B.B.O. On July 6, 1998, Golenbock moved to suppress those statements. She contended that she had been coerced to answer questions by the threat that assertion of her Fifth Amendment privilege would be used against her in the B.B.O. proceeding. Stein did not join in the motion or file a separate motion to suppress. In support

of her motion, Golenbock submitted her affidavit and that of Barshak, quoted supra.

On August 20, 1998, the district court denied Golenbock's motion in a written decision, stating:

> In this case, Golenbock did not face the ominous choice "between the rock and the whirlpool," because, although she was subject to a negative inference based upon her silence, she was not subject to automatic disbarment. Instead, in the B.B.O. proceeding she, like defendants in any civil proceeding, had to choose between remaining silent and risking an adverse inference on the one hand, and giving testimony that could be used against her in a subsequent criminal proceeding on the other. Because Golenbock's testimony was not coerced, as that term is defined in Garrity [v. New Jersey, 385 U.S. 492 (1967)], her motion to suppress statements made to the B.B.O. will be denied.

At trial, the government introduced excerpts from thirty-three pages of B.B.O. testimony, which were admitted in evidence against Golenbock. The excerpts included Golenbock's testimony concerning her payment of the mortgage, tax and other payments on the Wellfleet property, as well as the proceeds of the sale of the property. Neither Golenbock nor Stein made a contemporaneous objection.

G.    The criminal trial

The two-week jury trial of all three defendants commenced in March, 1999. At trial, an expert testified that

-13-

the value of the Wellfleet property, as of October 4, 1990, was $120,000. There were two mortgages totaling approximately $100,000 and approximately $2,000 worth of tax liens.

By way of defense at the trial, Golenbock and Stein contended that they did not have to list the conveyance of the Wellfleet property in their bankruptcy schedules because the transfer was in the ordinary course of business (i.e. real estate development). After the property was conveyed to Otis, defendants contended, Golenbock managed the property and Stein "looked after necessary repairs and made sure the bills were paid." The mortgage was paid with monies Otis provided to Golenbock in her role as property manager. The main source of income for these payments was the Adams Street Realty Trust, composed of rental properties in Lowell, Massachusetts. Golenbock and Stein had transferred their beneficial interest in those properties to Otis in November, 1991, with the bankruptcy court's permission. The tenants of the Lowell properties often paid in cash, defendants asserted, which accounted for Golenbock and Stein's cash payments for the mortgage and other expenses associated with the Wellfleet property. Stein was the only defendant who testified at trial.

Stein and Otis moved for acquittal under Fed. R. Crim. P. 29 at the close of the government's case. The court denied both motions.

Neither Stein nor Otis renewed her motion for acquittal after the close of her defense. On April 12, 1999, the jury found Golenbock and Stein guilty of both counts. Otis was convicted on the conspiracy count and acquitted on the substantive bankruptcy fraud count.

H.      Sentencing

On July 8, 1999, the trial court determined that Golenbock and Stein each had an adjusted offense level of 16. The computation was based on a base offense level of 6, with upward adjustments for their roles in the offense as leaders, supervisors, organizers, or managers of Otis; for more than minimal planning and more than one victim; and for the amount of the intended loss, which was determined to be $73,906.66.

Golenbock and Stein were each sentenced to twenty-one months of imprisonment followed by thirty-six months of supervised release. Otis received a sentence of five months in prison and twenty-four months of supervised release.

**II.**

In these consolidated appeals, the defendants advance various arguments. First, Golenbock and Stein assert that the

district court erred in not suppressing at trial testimony provided by Golenbock in proceedings conducted by the Board of Bar Overseers. Golenbock and Stein also dispute the court's sentencing enhancement based on the intended loss for which they were responsible. Stein and Otis contend the evidence was insufficient to support their convictions. Stein further maintains that her sentence should not have been enhanced to reflect a leadership role in the offense. Finally, Otis argues that the indictment was deficient as to the charges against her. We find no reversible error as to any of these matters, and affirm the defendants' convictions and sentences.

A.        Golenbock's B.B.O. testimony (Golenbock and Stein)

Golenbock and Stein both contend that because Golenbock's B.B.O. testimony was coerced, it should have been suppressed at their criminal trial.[3] In reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error, and its conclusions of law and rulings on the constitutionality of the government's conduct de novo. See United States v. Leon-Delfis, 203 F.3d 103, 107 (1st Cir. 2000).

Golenbock argues that she reasonably believed that if she refused to testify before the B.B.O., she could be subject

---

[3]Because Stein's appeal on this issue is derivative of Golenbock's, we address them together referring only to Golenbock.

-16-

to an adverse inference as to the matters at issue in that proceeding, with the practical outcome being her disbarment. She contends that this impending threat of disbarment rendered her testimony involuntary and thus inadmissible at her criminal trial. We think, however, that the penalty of adverse inference and possible disbarment was too conditional to establish a conclusion that her B.B.O. testimony was compelled in contravention of the Fifth Amendment.

The Fifth Amendment secures an individual's privilege "to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." Spevack v. Klein, 385 U.S. 511, 514 (1967) (Douglas, J.) (plurality opinion quoting Malloy v. Hogan, 378 U.S. 1, 8 (1963)). The Fifth Amendment not only protects against being involuntarily called as a witness against oneself in a criminal prosecution,

> but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.

Lefkowitz v. Turley, 414 U.S. 70, 77 (1973).

The Fifth Amendment has been held to protect individuals from the threat of substantial economic sanction for exercising their rights. See id. at 82-83 (state contractors

-17-

barred from state business for five years for refusal to testify before grand jury); Gardner v. Broderick, 392 U.S. 273 (1968) (police officer discharged for refusal to testify before grand jury). In Spevack, the Court held that an attorney's refusal, on grounds of self-incrimination, to produce financial records and to testify at a judicial inquiry in a disciplinary proceeding was not a constitutionally permissible basis for his disbarment. Four members of the court described disbarment as a "costly" sanction within the meaning of the Fifth Amendment, and went on to state:

> The threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawyer relinquish the [Fifth Amendment] privilege.

Spevack, 385 U.S. at 516.

On the same day, the Court similarly held that statements elicited as a result of compelling a choice between self-incrimination and the loss of a public job were inadmissible in a later criminal proceeding. See Garrity v. New Jersey, 385 U.S. 493, 498 (1967). There, police officers were summoned to appear before a state investigative body examining irregularities in criminal cases. They were informed that anything they said could be used against them in subsequent criminal proceedings, but if they refused to answer they would

be subject to removal from office.  Id. at 494.  The officers answered the questions.  Later, they were indicted and tried for crimes relating to the earlier questioning, and their statements were used at trial.  Id. at 495.  The Supreme Court reversed their convictions on the ground that their testimony was involuntary because it was under threat of job termination.  Id. at 497-98.[4]

Where, however, invocation of the Fifth Amendment does not, by itself, result in forfeiture of the job or license in question, the fact that claiming the Fifth may, as a practical matter, result in damage to one's chances of retaining the privilege at stake does not necessarily establish a constitutional violation.  The effect must be "capable of forcing the self-incrimination which the Amendment forbids."  Lefkowitz v. Cunningham, 431 U.S. 801, 806 (1977); see also Flint v. Mullen, 499 F.2d 100, 104 (1st Cir. 1974) ("[N]ot every undesirable consequence which may follow from the exercise of

_____

[4]Where the government seeks to compel testimony by threat of loss of livelihood, the witness may rightfully refuse to answer unless he is protected against the use of the compelled answers in any subsequent criminal case.  See United States v. Perez-Franco, 873 F.2d 455, 462 (1st Cir. 1989) (citing Turley, 414 U.S. at 78).  A state may compel incriminating answers to its questions, however, if the testimony and its fruits are rendered unavailable for use in subsequent criminal proceedings, i.e. through a grant of immunity.  See Turley, 414 U.S. at 84-85.

-19-

the privilege against self-incrimination can be characterized as a penalty.").

Hence the Supreme Court has adhered to the "prevailing rule" that the Fifth Amendment does not forbid allowing adverse inferences to be drawn against parties to civil actions from their refusal to testify in response to probative evidence offered against them. Baxter v. Palmigiano, 425 U.S. 308, 317 (1976). In Baxter, the Court held that permitting the drawing of an adverse inference from a prisoner's silence in a prison disciplinary hearing was constitutionally permissible. See id. at 316-20. The Baxter court differentiated the effects of the prisoners' silence from the automatic penalties at issue in other cases:

> In this respect, this case is very different from the circumstances before the Court in the Garrity-Lefkowitz decisions, where refusal to submit to interrogation and to waive the Fifth Amendment privilege, standing alone and without regard to the other evidence, resulted in loss of employment or opportunity to contract with the State. There, failure to respond to interrogation was treated as a final admission of guilt.

<u>Id.</u> at 317-18.[5]  The Supreme Court later distinguished its holding in <u>Baxter</u> from a case in which, pursuant to a New York statute, an attorney was divested of his state political party offices when he refused to waive his constitutional immunity before a special grand jury:

> <u>Baxter</u> did no more than permit an inference to be drawn in a civil case from a party's refusal to testify.  Respondent's silence in <u>Baxter</u> was only one of a number of factors to be considered by the finder of fact in assessing a penalty, and was given no more probative value than the facts of the case warranted; here, refusal to waive the Fifth Amendment leads automatically and without more to imposition of sanctions.

<u>Lefkowitz</u> v. <u>Cunningham</u>, 431 U.S. 801, 808 n.5 (1977).

Relying on <u>Garrity</u>, Golenbock insists that she was forced to choose between her livelihood as an attorney and incriminating herself in the B.B.O. investigation.  Unlike the police officers in <u>Garrity</u>, however, Golenbock was not subject to automatic loss of her position if she asserted her right not to testify.  While refusal to waive the Fifth Amendment might increase the risk that she would be disbarred, disbarment would

---

[5]Golenbock points out that in <u>Baxter</u>, there was no pending criminal prosecution, and the State had not sought to make evidentiary use of the inmate's silence at the disciplinary hearing in any criminal proceeding.  <u>See</u> 425 U.S. at 317.  We have applied <u>Baxter</u>, however, to situations involving criminal charges.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Indorato</u>, 628 F.2d 711, 716 (1st Cir. 1980).

-21-

not result automatically and without more. Hence, she was not threatened with a "penalty" within the meaning of <u>Garrity</u> for invoking her Fifth Amendment privilege.

Attorney Barshak's affidavit makes this point clear. He stated that "the B.B.O. <u>would be allowed to</u> draw from her silence any adverse inferences relating to any area of the investigation she refused to discuss." (Emphasis added). It is true that Barshak went on to opine to his client that "those adverse inferences would mean that the B.B.O. would find against her in relation to those areas of investigation and that as a result, she would be disbarred or suspended." His prediction of disbarment, however, rested on his estimate of how the B.B.O. would exercise its ability to draw adverse inferences. Mr. Barshak did not suggest that the B.B.O. was required to disbar her as an automatic sanction for Golenbock's failure to waive her constitutional rights.

The B.B.O.'s own rules and practice make it plain that Golenbock was not faced with an automatic sanction. The B.B.O. makes its decisions based on a preponderance of the evidence, with the Bar Counsel bearing the burden of proof. <u>See</u> Rules of the Board of Bar Overseers, § 3.28. Nothing in the record suggests that the B.B.O. has either a formal rule or an unwritten policy or practice to disbar or suspend attorneys

-22-

simply for invoking Fifth Amendment privileges.  Hence, the consequences of Golenbock's

assertion of the privilege before the B.B.O. were the same as in any civil proceeding, in that the fact-finder could -- but was not required to -- draw an adverse inference from such an assertion.  See Baxter, 425 U.S. at 317; see also Federal Deposit Ins. Corp. v. Elio, 39 F.3d 1239, 1248 (1st Cir. 1994).

Golenbock contends, nevertheless, that the risk of disbarment arising from her refusal to testify was sufficiently coercive to render her B.B.O. testimony inadmissible.  This argument ignores the reasoning of Baxter, on which this court has relied to distinguish between the threat of automatic loss of one's livelihood and the threat of an inference that might lead to such a loss.  In United States v. Indorato, 628 F.2d 711 (1st Cir. 1980), we held that a state police officer's self-incriminating statements made during a theft investigation were not coerced, where nothing in relevant police department rules mandated dismissal for invoking Fifth Amendment rights.  We observed:

> In all of the cases flowing from Garrity, there are two common features: (1) the person being investigated is explicitly told that failure to waive his constitutional right against self-incrimination will result in his discharge from public employment (or a similarly severe sanction imposed in the case of private citizens); and (2) there is

-23-

> a statute or municipal ordinance mandating
> such procedure.

Id. at 716.  In Indorato, we said that absent elements of this nature, fear of punishment as a consequence of claiming one's rights does not protect one from the government's subsequent use of self-incriminating statements in a criminal trial.[6]  See id.

As said, there is no evidence of any B.B.O. rule mandating that claiming one's constitutional right to remain silent must necessarily result in disbarment.  Golenbock could have asserted her Fifth Amendment privilege and later argued to the B.B.O. fact-finder that the evidence against her, as a whole, was inadequate to warrant disbarment.  We conclude that "[n]either Garrity nor any of its progeny brings defendant within the ambit of the coerced testimony doctrine."  Indorato, 628 F.2d at 716.  We affirm the district court's denial of Golenbock's motion to suppress.

B.          Intended loss calculation (Golenbock and Stein)

The district court increased Golenbock and Stein's base offense levels by six levels because of the amount of the

---

[6]We recognize that Golenbock's fear of disbarment was based on the advice of a seasoned attorney.  However, the fact that, as a matter of strategic choice in the B.B.O. proceeding, Golenbock could have had good reason to fear disbarment if she did not testify is not the same as being faced with automatic disbarment for failure to testify.  One can imagine situations where the adverse inferences drawn from refusing to testify might be overcome by other factors.

intended loss for which they were responsible.[7]  The court determined that the intended loss was approximately $74,000, which it characterized as "the amount of the net gain over the mortgage and expenses."  The district court's findings were based on the facts that the Wellfleet property was sold in June, 1996, for $175,000, and that $73,906.66 remained after the mortgages, tax obligation and brokerage commission were deducted from the escrow.

We review a district court's intended loss findings for clear error.  See United States v. Robbio, 186 F.3d 37, 43 (1st Cir. 1999); see also United States v. Cali, 87 F.3d 571, 575 (1st Cir. 1996) (clear error standard applied to sentence enhancements even where defendant objected in district court). "Courts can, and frequently do, deal with rough estimates, and as such, a party dissatisfied with a sentencing court's quantification of the amount of loss . . . must go a long way to demonstrate clear error."  United States v. Rowe, 202 F.3d 37, 42 (1st Cir. 2000) (internal citations omitted).

Golenbock and Stein argue that the district court's calculation was flawed because it did not take into account the

---

[7]The district court's sentence enhancement was based on the loss to creditors Golenbock and Stein intended, not the creditors' actual loss.  It is undisputed that the Wellfleet property was ultimately discovered by the bankruptcy trustee and that the proceeds of the property's sale were recovered.

more than five years of "carrying costs" that defendants had paid while the property grew in value from its $120,000 purchase price in 1990 to its $175,000 sale price in 1996. During this time period, Golenbock and Stein made insurance and mortgage payments totaling approximately $70,000. Golenbock and Stein argue that the creditors reaped the benefit of an increase in the value of the property that was created by Golenbock and Stein's payments. Golenbock and Stein argue there was no intended loss whatsoever, because the amount they paid to carry the property over the five years approximately equaled the net value in 1996. Had they kept the sales proceeds, their net would be zero after subtracting the payments they made.

But we believe the district court's intended loss calculation was justifiable and well within the standards of the Sentencing Guidelines and relevant case law. Section 2F1.1 of the Guidelines provides that an offense level shall be increased by six levels if the loss or intended loss amounts to more than $70,000. Intended loss need not be determined with precision; "[t]he court need only make a reasonable estimate of the loss, given the available information.'" United States v. Pervaz, 118 F.3d 1, 10 (1st Cir. 1997) (quoting U.S.S.G. § 2F1.1, cmt. (n.8)); see also United States v. Parsons, 141 F.3d 386, 392 (1st Cir. 1998) (loss is a proxy for the seriousness of the

offense).  Section 2F1.1 does not otherwise specify or restrict the means by which intended loss may be calculated in a bankruptcy case.  Compare U.S.S.G. § 2F1.1 cmt (n.8) (providing special rules for calculating loss in particular types of cases, including loan fraud).[8]

Here, it was reasonable for the district court to treat the $74,000 net gain realized on the 1996 sale of the property as the measure of the creditors' intended loss.  For each of the five previous years during which Golenbock and Stein held it, their exclusive control gave them the economic use of the property in addition to the profit they later realized when the property was sold.  Golenbock and Stein could rent the property to others and on occasion did so.  In lieu of renting it, they could and did themselves enjoy its use.  In either event the property, during all of the years when they were paying the carrying charges, had immediate value to those who controlled it, just as ownership of one's home provides continuous economic value distinct from the capital gain when the home is eventually

---

[8]Golenbock and Stein seek to bolster their argument by relying on loan fraud cases and the Sentencing Guidelines' commentary on loan fraud.  The Guidelines recognize loan fraud as a specific exception to the usual methods of calculating loss set forth in §§ 2F1.1 and 2B1.1.  See U.S.S.G. § 2F1.1 cmt. (n.8(b)).  We find no error in the district court's refusal to extend the exceptional methodology used for loan fraud cases to bankruptcy fraud.

sold. In the circumstances, we think the district court could reasonably treat the economic value of the property during the years Golenbock and Stein fraudulently withheld it from their creditors as offsetting its carrying expenses, leaving the $74,000 net gain on the 1996 sale as the amount Golenbock and Stein would have realized had the fraud succeeded and, conversely, as the loss the fraud would have caused to the creditors had the scheme worked. Golenbock and Stein clearly never intended by paying the mortgage and other expenses to benefit their creditors; during this period they alone retained the exclusive right to the property's use. We do not find clear error in the district court's refusal to subtract Golenbock and Stein's annual payments from the $74,000.

Nor is there error in the fact that the court evaluated the intended loss at the time Golenbock and Stein sold the Wellfleet property, rather than at the time they filed for bankruptcy. Like conspiracy, bankruptcy concealment has been described as a continuing offense. See 18 U.S.C. § 3284;[9] United

[9]Section 3284 provides:

> The concealment of assets of a debtor in a case under title 11 shall be deemed to be a continuing offense until the debtor shall have been finally discharged or a discharge denied, and the period of limitations shall not begin to run until such final discharge or denial of discharge.

-28-

States v. Gilbert, 136 F.3d 1451, 1453 (11th Cir. 1998); Sultan v. United States, 249 F.2d 385, 386 (5th Cir. 1957) (noting that § 3284, in addition to describing a statute of limitations, has substantive consequences). "[C]oncealment by its nature is an act which goes on until detected or its consequences are purged." Sultan, 249 F.2d at 386. The fraud was still ongoing at the time the Wellfleet property was sold, as the concealment had not yet been revealed at that point. Hence, it was proper for the court to base its intended loss findings on the value of the property at the time of the sale.

C.        Sentencing enhancement (Stein)

The district court found that Stein was "an organizer, leader, manager, or supervisor" for the purposes of U.S.S.G. § 3B1.1(c), and accordingly added two levels to her base offense level. Stein argues that the evidence does not support the district court's conclusion. Because a sentencing court's role-in-the-offense determination is necessarily fact-specific, we review deferentially and only for clear error or mistake of law. See United States v. Alicea, 205 F.3d 480, 485 (1st Cir. 2000).

The government must prove by a preponderance of the evidence that Stein's role satisfies the requirements of

§ 3B1.1(c).  See id. at 485.  A two-level increase pursuant to § 3B1.1(c) is justified

> if the sentencing court supportably finds that (1) the criminal enterprise involved at least two complicit participants (of whom the defendant may be counted as one), and (2) the defendant, in committing the offense, exercised control over, organized, or was otherwise responsible for superintending the activities of, at least one of those other persons.

United States v. Cruz, 120 F.3d 1, 3 (1st Cir. 1997) (en banc).  In determining whether the defendant qualifies for the enhancement, the Sentencing Guidelines instruct courts to consider seven factors:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control exercised over others.

U.S.S.G. § 3B1.1 cmt. (n.4).  This list of factors is "representative rather than exhaustive."  United States v. Tejada-Beltran, 50 F.3d 105, 111 (1st Cir. 1995).

Stein opposed this enhancement in objections to the presentence report (PSR) and at sentencing.  On appeal, Stein makes a very brief and general argument that the sentencing enhancement was erroneous because there was no evidence that she

supervised or managed Otis's criminal conduct.  We perceive no clear error.

The court could have reasonably found that Stein, together with Golenbock, devised and carried out a plan to conceal the Wellfleet property from bankruptcy creditors and the trustee by having Otis hold it for them in trust.  Stein signed the backdated deed of the Wellfleet property to Otis.  Stein met with the bankruptcy attorney, provided the information for her filing and attended the meetings of creditors.  After they conveyed title to Otis, Stein and Golenbock forwarded the tax forms to her.

The testimony of Stein's and Golenbock's secretaries reflects that Stein as well as Golenbock exercised continuing decision-making authority with respect to the Wellfleet property.  Stein paid or authorized the payment of bills, sometimes with handwritten directions on the bills.  And with Golenbock, Stein received tax documents and insurance forms at her address.  Stein and Golenbock made the arrangements with the real estate broker when the property was being sold.  When the proceeds for the sale of the Wellfleet property were issued to Otis, amounting to more than $70,000, Otis signed them over to accounts from which Stein benefitted.

It is true that there is little evidence that Stein alone -- i.e., acting separately from Golenbock – directed Otis's activity related to the concealment. However, Stein does not contend that two organizers cannot act jointly to direct the activity of another, and we have found no authority so stating. Hence, we perceive no clear error in the district court's determination that Stein was a leader, supervisor, organizer or manager of Otis.

D.        Sufficiency of the evidence (Stein and Otis)

On appeal, Stein and Otis challenge the sufficiency of the evidence presented against them.  It is well-established that in order to challenge the sufficiency of the evidence after a conviction, the defendant must have preserved her Rule 29 motion by moving for an acquittal at the close of the defense's evidence at trial.  See United States v. Castro-Lara, 970 F.2d 976, 980 & n.2 (1st Cir. 1992); United States v. Concemi, 957 F.2d 942, 950 (1st Cir. 1992).

> Absent a renewal of the motion for acquittal after presenting the case for the defense, the motion for acquittal is considered waived.  Hence, in order to prevail on a challenge to the sufficiency of the evidence, "the defendants must then demonstrate "clear and gross" injustice.'"

Concemi, 957 F.2d at 950 (internal citations omitted).

-32-

Here, Stein and Otis moved for acquittal under Fed. R. Crim. P. 29 at the close of the government's evidence. Neither afterward renewed her Rule 29 motion at the close of the defense's evidence. Hence, we apply the "clear and gross injustice" standard to this portion of Stein and Otis's appeal. See id. After careful review, we conclude that the evidence presented at trial against Stein and Otis was sufficient to support a guilty verdict beyond a reasonable doubt.

1. Stein

Stein argues that there was insufficient evidence to support her conviction because she simply "followed Golenbock's lead at every step of the way, without knowing that Golenbock was concealing the property from the bankruptcy trustee." She contends that the evidence showed that only Golenbock and Otis controlled the property. There is no support for the conclusion, Stein argues, that she knowingly retained an interest in the Wellfleet property or that she intentionally concealed (or conspired to conceal) it from her bankruptcy creditors. We disagree, based on reasonable inferences from other evidence described in section II.C., supra, as well as from the following evidence.

Stein filed her bankruptcy separately from Golenbock's. Stein's bankruptcy schedules and statement of financial affairs

not only failed to list the Wellfleet property as a property in which she held an interest, but also failed to list the Cape Cod Five as a creditor, failed to disclose (as the forms required had Stein's interest been transferred, as claimed, the previous December) that she had previously been a part owner of the Wellfleet property within the year before she filed for bankruptcy, and failed to disclose the civil litigation relating to a hot tub at the Wellfleet property. In other words, there is evidence that even if Stein was unaware that she had retained a continuing interest in the Wellfleet property after the alleged December 31, 1989, transfer to Otis, she failed to make appropriate disclosure as to multiple relevant aspects of her relationship to the Wellfleet property, including her involvement before the transfer.

Stein attended 341 meetings and answered questions, affirming that the information contained in the schedules was truthful and accurate. Her bankruptcy attorney, Jeffrey Schreiber, testified that all the information on the schedules was obtained from Stein or Golenbock. Schreiber testified that he did not learn of the Wellfleet property from Stein or Golenbock, however, but from a B.B.O. attorney only a couple of years before the trial in this case.

Stein contended at trial that the Wellfleet property in fact was legitimately and wholly conveyed to Otis nine months before the bankruptcy filing. Sufficient evidence would have enabled a reasonable jury to conclude otherwise, however. First, while the deed to Otis was dated and notarized nine months earlier, it was not recorded until October 4, 1990, a week after the filing of the individual bankruptcy petitions by Stein and Golenbock. Stein's testimony as to where the deed was signed and notarized was confused. She testified that the deed was signed and notarized in Andover, which is in Essex County, but on its face the deed indicates that it was executed and notarized in Middlesex County, where Golenbock and Stein resided. Second, Golenbock and Stein continued to pay the mortgage and other expenses relating to the property after December 31, 1989, strongly suggesting no actual transfer to Otis. They did not receive the stated consideration for the transfer. Their names were not changed on bills relating to the property until 1991. Stein conceded that she had never attempted to list the property for sale with a real estate broker, but had just talked to Otis, a close friend, about it. Additionally, the Declaration of Trust for the B.Z. Realty Trust, of which Otis was supposedly the trustee, was recorded only at the time the deed was recorded; this document was

-35-

purported to have been executed on August 1 of either 1989 or 1990 (both dates appeared on it). From this evidence, the jury could have concluded that Stein had never transferred nor intended to transfer her interest in trust to Otis on December 31, 1989, prior to the bankruptcy. Indeed, the jury could have determined that, even if prepared on that date, the deed was not delivered then or that it may even have been made later and backdated, after Golenbock and Stein had filed for bankruptcy. In any case, the evidence suggests that the deed had been fabricated as part of defendants' scheme to conceal the property from bankruptcy creditors.

Stein testified that between 1992 and 1994, the Wellfleet property payments were all made from the Adams Street Trust account because Otis had purchased the beneficial interest in that trust. This testimony was corroborated by that of her secretary, Beverly Rubin. However, neither Stein nor Rubin provided any supporting documents. Furthermore, there was contradictory evidence: checks and other payments relating to the Wellfleet property, made during that time period, from accounts and sources other than the Adams Street Trust account, including their bankruptcy debtor-in-possession checking account. In addition, Stein's signature appears on non-Adams Street Trust checks in the early 1990s on payments for the

Wellfleet property, after the property was sold to Otis. Furthermore, after Stein and Golenbock received their bankruptcy discharges, but while their bankruptcy cases were still open, they began paying the Cape Cod Five loans directly from an account in Golenbock's name. Two of those checks were signed by Stein in October, 1995. Moreover, despite the stated consideration of $108,000, no funds appear to have changed hands as between Otis and the purported sellers, nor was the Cape Cod Five notified of the purported sale to Otis.

Hence, the jury could have concluded that the sale to Otis was a sham and that Golenbock and Stein paid the Wellfleet expenses from their own funds, and that Stein's testimony at trial about the payments was false. See United States v. Jimenez-Perez, 869 F.2d 9, 11 (1st Cir. 1989) (the jury "could legitimately have presumed that the fabrication was all the more proof of [defendants'] guilt"). As the evidence was sufficient for the jury to have concluded that Stein knowingly and fraudulently concealed her interest in the Wellfleet property from her bankruptcy creditors, and conspired with Golenbock and Otis to do so, there was no clear and gross injustice in her conviction.

2.      Otis

Otis argues that there was insufficient evidence that she willfully joined the conspiracy to conceal the Wellfleet property from Golenbock's and Stein's bankruptcy creditors. She contends that she was unaware of any improprieties throughout the concealment scheme, and hence lacked the requisite intent to be convicted of conspiracy. We hold that a reasonable jury could have concluded otherwise.

The government points out that Golenbock and Otis were close friends and Golenbock was a godmother to one of Otis's sons. This alone, of course, would be insufficient to establish that Otis knew of the concealment, although, together with other probative evidence, it might be a further factor making such knowledge more likely. The government points out that Golenbock issued a $15,000 check to Otis a few days after the bankruptcy filing, then recorded the earlier-dated deed of the Wellfleet property to Otis one week later. From this, the government argues, the jury could have found that Otis knowingly was being paid to hold the property for Golenbock's and Stein's benefit.

Precisely when Otis's involvement began is not critical. "[I]t is well settled that one may join a conspiracy subsequent to its original formation by adopting its goals and adhering to its purposes." United States v. Spock, 416 F.2d 165, 191 (1st Cir. 1969) (citing Blumenthal v. United States,

332 U.S. 539, 559 (1947)). Where a defendant knows of the bankruptcy and holds or disposes of assets for the debtor, the evidence is "sufficient to warrant the jury's inferring purposeful knowledge and participation in the plan first set in motion previously" by the debtor. Sultan, 249 F.2d at 387. Here, even if Otis had been unaware of the concealment at the time of the conveyance, there is ample circumstantial evidence for a jury to find that she later was knowingly and willfully involved in the conspiracy.

First, there is evidence that Otis knew of the bankruptcy proceedings during the time period that she held the Wellfleet property in trust (August 1989 or August 1990 to June 1996). In 1992, Otis submitted a pleading from Golenbock's bankruptcy case to the IRS. Moreover, she admitted her awareness of the bankruptcy in her B.B.O. deposition in January, 1996.

Second, there was evidence that Otis, who was an attorney herself, would have known that the circumstances of the transfer and subsequent handling of the Wellfleet property were irregular. The jury could have inferred that as the supposed purchaser of the property, Otis was aware that the purported transfer to her was a sham. She admitted that she made none of the expense payments for the property and was not involved in

renting it. Although the deed stated she took the property subject to the Cape Cod Five's two mortgages, Otis never received mortgage bills, as they were sent to Golenbock and Stein's office. When the decision was made to sell the property, Golenbock and Stein, not Otis, conducted the communications with the broker. And when the property was sold, Otis turned over all the proceeds to Golenbock's and Stein's minor son.

Moreover, there is evidence that Otis actively attempted to cover up these irregularities. Although she acknowledged that she did not provide any of the funds to pay the loans, she fraudulently claimed the mortgage interest deduction for several years on her federal income tax returns. Furthermore, Otis made false statements in a B.B.O. deposition about the matter. The jury saw the transcripts and heard the tapes of her testimony, from which they could have drawn additional negative inferences both to her credibility and her culpability. See Jimenez-Perez, 869 F.2d at 11.

In sum, there is evidence from which the jury could have reasonably concluded that Otis knew of the bankruptcy and participated in the conspiracy to conceal the Wellfleet property. Hence, there was no clear and gross injustice in her conviction.

E.        Defective indictment (Otis)

Otis was convicted only on the conspiracy charge, set forth in Count II of the superseding indictment.  She now contends that Count II failed to adequately inform her of which paragraph of 18 U.S.C. § 152 was charged.  Because she did not challenge the sufficiency of the indictment below, we review for plain error only.  See United States v. Murphy, 762 F.2d 1151, 1155 (1st Cir. 1985); Fed. R. Crim. P. 52(b).

Count II charges that Otis, Golenbock and Stein

> "did knowingly, willfully, and unlawfully conspire and agree among themselves to commit the following offense against the United States:
>
> to knowingly and fraudulently conceal from creditors and the trustee in bankruptcy proceedings under Title 11 of the United States Code (the bankruptcy laws), captioned In re: Wendy B. Golenbock, case number 90-41635-JFQ and In re: Cheryl B. Stein, case number 90-41638-JFQ, in the United States Bankruptcy Court for the District of Massachusetts, property belonging to the estates of the debtors WENDY B. GOLENBOCK and CHERYL B. STEIN, to wit, their beneficial interest in the real property located on Bond Street in Wellfleet, Massachusetts (also at times referred to as South Wellfleet), also identified at times as being on Old Wharf Road or Paine Avenue or lots 63 and 80, and their agreement with SUSAN OTIS, aka SUSAN ALEKMAN concerning her holding that real property in trust for the benefit of WENDY B. GOLENBOCK and CHERYL B. STEIN, all in violation of Title 18, United States Code Sections 152 and 2.

-41-

(Emphasis added.)

Otis argues that in Count II, the statement "all in violation of 18 U.S.C. § 152 and 18 U.S.C. § 2" was not clear enough to notify her of what crimes she was alleged to have committed. An indictment is sufficient "if the offense is described with sufficient clarity to show a violation of law, and enables the accused to know the nature and cause of the accusation against him and to plead an acquittal or conviction in bar of future prosecution for the same offense." United States v. Fusaro, 708 F.2d 17, 23 (1st Cir. 1983) (citing Hamling v. United States, 418 U.S. 87 (1974)). Generally, an indictment passes muster if it sets forth the offense in the words of the statute, including all the elements of the offense. See United States v. Penagaricano-Soler, 911 F.2d 833, 839 (1st Cir. 1990).

18 U.S.C. § 152 (App. 1994), the version of the statute under which defendants were charged, describes several forms of criminal conduct in the bankruptcy context, including concealment of assets, false oaths and claims, and bribery.[10]

---

[10]Before it was amended in 1994, 18 U.S.C. § 152 did not contain paragraph numbers. See Pub. L. 103-394, § 312(a)(1)(A). The amended statute applies only to bankruptcy cases filed with the bankruptcy court after October, 1994. See id. at § 702. As Golenbock and Stein's bankruptcy petitions were filed in September, 1990, we apply the earlier version of the statute.

-42-

Otis was charged with a violation of the first provision (now the first paragraph) of § 152, prohibiting concealment of assets, which sets forth in relevant part:

> Whoever knowingly and fraudulently conceals from the receiver, custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or from creditors in any bankruptcy proceeding, any property belonging to the estate of a bankrupt;
>
> . . . Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

Count II of the superseding indictment tracks the above-cited paragraph with sufficient clarity to place Otis on notice of the elements of the charged offense. See United States v. Grant, 971 F.2d 799, 802 (1st Cir. 1992) (elements of bankruptcy concealment are knowing concealment of property of one's bankruptcy estate from the bankruptcy trustee, with specific intent to defraud creditors). Count II sets forth the time and place of offense, identifies the relevant bankruptcy proceedings at issue, the property alleged to have been concealed, and the persons from whom it was concealed. See United States v. Arge, 418 F.2d 721, 724 (10th Cir. 1969) (an indictment for bankruptcy concealment must allege time and place, knowing and fraudulent intent, a description of the property concealed, the persons from whom it was concealed, and

-43-

that it was property of the bankrupt estate).  Moreover, the indictment identifies the intent: that Otis "knowingly, willfully, and unlawfully" conspired to commit the offense, and that she "knowingly and fraudulently" concealed the property. See id. Hence, we conclude that the charging language in Count II adequately set forth both the language and elements of the first paragraph of 18 U.S.C. § 152 and informed Otis of the relevant offense.

Otis also contends that the indictment was defective because it cited to 18 U.S.C. § 2 without setting forth its specific language.[11]  Charges under § 2 need not be specifically referenced in an indictment, however.  See United States v. Footman, 215 F.3d 145, 153-54 (1st Cir. 2000); United States v. Andrade, 135 F.3d 104, 110 (1st Cir. 1998).  Hence, there is no

_____

[11]Section 2 provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
>
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

We have stated that § 2 is a general definitional statute that does not describe a separate offense from the underlying substantive crime.  See United States v. Mitchell, 23 F.3d 1, 2 (1st Cir. 1994).

-44-

error, plain or otherwise, in the omission of the specific language of § 2, and we affirm Otis's conviction on the indictment.

<u>Affirmed</u>.